J-S24043-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| TRUTH SHYDEE WILSON | : | |
| | : | |
| Appellant | : | No. 176 WDA 2025 |

Appeal from the PCRA Order Entered February 11, 2025
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s):  CP-02-CR-0004689-2018

BEFORE:  NICHOLS, J., McLAUGHLIN, J., and LANE, J.

MEMORANDUM BY LANE, J.:                    **FILED: August 27, 2025**

Truth Shydee Wilson ("Wilson") appeals from the order denying his petition filed pursuant to the Post Conviction Relief Act ("PCRA")[1].  We affirm.

For approximately one month between December 2017 and January 2018, Wilson was living with his girlfriend and her seven-to-eight-year-old child, I.B., in their home.  When the relationship ended and Wilson moved out, I.B. reported that Wilson had put his penis inside I.B.'s rectum approximately four to six times during his stay.  Based on this report, police arrested Wilson, and the Commonwealth charged him with rape of a child, unlawful contact with a minor, indecent assault of a person less than thirteen years of age, endangering the welfare of children ("EWOC"), and corruption of minors.

Following his arrest, Wilson sought representation from the public defender's office, who appointed Angelina Lowers, Esquire, ("Attorney

---

[1] *See* 42 Pa.C.S.A. §§ 9541-9546.

Lowers") as his trial counsel. At some point thereafter, the Commonwealth presented Attorney Lowers with an offer to withdraw two of the charges and seek an aggregate sentence less than the mandatory minimum in exchange for Wilson entering a guilty plea.[2] The Commonwealth additionally filed a notice of its intention to introduce video of a forensic interview of I.B. into evidence pursuant to the tender years exception.[3] Wilson did not file a response to this motion, nor did the trial court make a definitive ruling on it.[4] Attorney Lowers subsequently resigned from the public defender's office, and in November 2018, it appointed Andrew J. Capone, Esquire ("Attorney Capone") as replacement counsel.

After entering his appearance as counsel, Attorney Capone filed a motion to compel discovery, requesting, *inter alia*, that the Commonwealth provide the defense with a copy of the video forensic interview. The trial court held a hearing on the motion, during which it directed the Commonwealth to make the video available to both Attorney Capone and Wilson, and provide Attorney Capone with a copy of the video's transcript. Notably, the trial court

_____

[2] Pursuant to 42 Pa.C.S.A. § 9718.2(a)(1), (b), Wilson was facing a mandatory twenty-five year minimum sentence, with a fifty year maximum, as a result of his previous conviction for a sexual offense.

[3] **See** 42 Pa.C.S.A. §§ 5981-5988 (creating an exception to the general rule against hearsay for an out-of-court statement made by a child due to the fragile nature of young victims of sexual abuse).

[4] Although the parties discussed this issue in subsequent hearings, including a lengthy discussion in the judge's chambers immediately prior to trial, the trial court did not definitively rule on the video's admissibility until midway through trial.

additionally inquired into the status of the Commonwealth's pending plea offer, to which Attorney Capone responded that he met "with [Wilson] in the jail, we discussed it, and he rejected the offer. And[,] I did convey that to [the Commonwealth]." N.T., 11/7/18, at 8.

In February 2019, Wilson proceeded to a jury trial, during which the Commonwealth presented testimony from I.B., I.B.'s mother, and a detective assigned to the case. Wilson testified in his defense. Relevantly, while Attorney Capone was cross-examining I.B. mid-way through the trial, he referenced I.B.'s forensic interview, which the trial court had not yet admitted into evidence. As a result, the Commonwealth once again motioned to have the video admitted into evidence, and after considering Attorney Capone's brief objection, the trial court granted the Commonwealth's motion. At the conclusion of trial, the jury convicted Wilson of each of the above-listed crimes.

On May 22, 2019, the trial court imposed an aggregate sentence of thirty to sixty years' imprisonment, followed by a consecutive five-years' probation. This Court affirmed the judgment of sentence. **See Commonwealth v. Wilson**, 240 A.3d 918 (Pa. Super. 2020) (unpublished memorandum). However, our Supreme Court vacated and remanded to this Court for reconsideration in light of **Commonwealth v. Raboin**, 258 A.3d 412 (Pa. 2021), "to address whether the forensic interview was admissible as evidence under the tender years exception to the hearsay rule." **Commonwealth v Wilson**, 272 A.3d 446, 447 (Pa. 2022). On remand, this

- 3 -

Court once more affirmed Wilson's judgment of sentence, determining, *inter alia*, that the instant case was distinct from **Raboin**, and that even if the trial court's admission of the forensic interview was in error, it was nonetheless harmless. **See Commonwealth v. Wilson**, 286 A.3d 1288, 1298-1301 (Pa. Super. 2022). Wilson again petitioned our Supreme Court for review, which it denied on June 21, 2023. **See Commonwealth v. Wilson**, 300 A.3d 322 (Pa. 2023). Wilson did not seek further review by the United States Supreme Court.

On January 3, 2024, Wilson filed a timely *pro* se PCRA petition,[5] his first. The PCRA court thereafter appointed counsel, who filed an amended petition in which Wilson argued, *inter alia*, that his trial counsel were ineffective for failing to adequately advise him whether to accept or reject the Commonwealth's plea offer.[6] The PCRA court ordered the parties to submit

---

[5] Under the PCRA, a petition must be filed within one year of the date the judgment of sentence becomes final. **See** 42 Pa.C.S.A. § 9545(b)(1). A judgment of sentence becomes final at the conclusion of direct review, including discretionary review in the Supreme Court of the United States, or the expiration of time for seeking such review. **See** 42 Pa.C.S.A. § 9545(b)(3). Here, because Wilson did not seek review by the United States Supreme Court, his judgment of sentence became final ninety days after our Supreme Court denied allowance of appeal, on September 19, 2023. **See** 42 Pa.C.S. § 9545(b)(3); **see also** U.S.Sup.Ct.R. 13 (providing that a petition for writ of certiorari in the United States Supreme Court must be filed within ninety days). Thus, Wilson had one year from this date, until September 19, 2024, to file his instant petition. As Wilson filed the instant petition on January 3, 2024, it is timely.

[6] Wilson also claimed in his petition that he was due certain credit for time served prior to the imposition of sentence.

briefs and held a hearing on the petition, during which it heard testimony from Attorney Lowers, Attorney Capone, and Wilson. We provide the relevant excerpts of this testimony, beginning with that provided by Attorney Lowers, as follows:

> [PCRA Counsel]: [W]hat was the nature of the plea discussions that you had with . . . Wilson?
>
> [Attorney Lowers]: I vaguely recall having a conversation with the district attorney at the time . . . about a plea offer, and once that was received in writing[,] I did communicate that to . . . Wilson at the jail one[-]on[-]one, and to my recollection he did not want to take the offer as written and we were going to counter with a counter plea offer.
>
> Q. Did you make a counteroffer?
>
> A. Yes. I believe that I left a voice mail on [the district attorney's] voice mail indicating that I had spoken with . . . Wilson and that we were sending a counteroffer in hopes that they would be amenable to that.
>
> Q. Do you recall what the counteroffer was?
>
> A. Our counteroffer was five to ten years.
>
> Q. Did you hear anything back from the Commonwealth?
>
> A. Shortly thereafter[,] I left the public defender's office and went to another job, and . . . I don't believe that I ever had that conversation with the district attorney prior to leaving the public defender's office and having the case reassigned.
>
> Q. Before you left the public defender's office did you prepare a memo for your successor counsel?
>
> A. Yes.
>
> * * * *

[Commonwealth's Attorney]: [At the pretrial conference] you were aware of the forensic interview in this case being available to you, correct, or soon to be available to you?

[Attorney Lowers]: I don't recall when I became aware of the forensic video. I do recall [myself and Wilson] setting up a time to go watch it and watching it, but I vaguely remember if that was initially in that initial discovery packet or not.

Q. And then you received the initial plea offer from the Commonwealth of [eight] to [sixteen] years, correct?

A. Eventually, yes, I did receive that.

Q. And what was your first impression of that offer based upon the facts of this case?

[PCRA Court]: And it was mandatory.

Q. There was a mandatory minimum in this case, correct?

A. Yes, that's correct, and I believe that this was outlined or referenced in the offer. My initial impression of the offer was that I wanted to counter and get less time.

Q. And you had a chance to speak to . . . Wilson about that offer?

A. I did. I did.

Q. In your discussions do you recall discussing the forensic interview at all?

A. I don't recall discussing with . . . Wilson the credibility of the witness or the details of what I watched in the interview. No, I don't.

Q. Was it your normal practice when you worked at the public defender's office to discuss issues of credibility when discussing plea offers?

A. I guess that the case depends. [E]ach case is different and each client wants something different out of their case, so, yes, you are as transparent as possible about all that, but I don't recall

specifically talking about the credibility of the witness with . . . Wilson.

Q. So you were as transparent as possible with . . . Wilson, right?

A. Yes.

Q. And whenever you communicated this [eight] to [sixteen] offer, what was his initial reaction [to] the offer?

A. . . . I don't recall his immediate reaction, but just that that was not acceptable and that we needed to try to get something lower.

Q. And did he have any impression on the case itself, did he think that he could beat the charges?

A. [M]y recollection of the case was that . . . Wilson had a desire to potentially go to trial on this case if the plea offer wasn't significantly lower.

N.T., 1/16/25, at 5-6, 9-11.

We now provide relevant portions of Attorney Capone's testimony, as

follows:

[PCRA Counsel]: Do you recall the nature of the plea discussions that you had with . . . Wilson?

[Attorney Capone]: I reviewed the plea offer that was provided in writing, Defense Exhibit B, and I think that it indicated [seven] to [fourteen] years.

Q. Did you discuss with . . . Wilson his chances of prevailing at trial?

A. I don't have any specific recollection of conversations that I had with . . . Wilson.

* * * *

Q. [At the November 7, 2018 status hearing,] you informed the [trial] court that the defense rejected the plea offer, correct?

A. Yes, I did.  I met with him in the jail[,] and we discussed it[,] and he rejected the plea offer.

Q. And then after that, during the same hearing, you asked for a copy of or an opportunity to review the video of the forensic interview?

A. I asked for a copy of the forensic interview first.  That request was denied and then I asked for a transcript to be produced, and I asked for my client to be transported so that he and I could watch the forensic interview together.

Q. So when you rejected the plea offer on November 7th[,] you had not yet seen the video?

A. That's correct.

Q. So you would not have discussed the video with . . . Wilson, prior to rejecting the plea offer on November 7th?

A. I could not have reviewed it prior to that because I hadn't seen it.

Q. Do you recall if you reviewed the video with . . . Wilson before trial?

A. So[,] I reviewed my notes and I reviewed [the November 7th status hearing transcript], and this indicates that I did, but I don't have any recollection of doing that.

* * * *

Q. Did you discuss with . . . Wilson how the jury would assess the credibility of the victim?

A. So[,] I recall specifically because I wrote a note about it that I discussed that under Pennsylvania law the testimony of a victim alone is sufficient to convict the defendant.  I do not recall whether or not we spoke about this specific victim's credibility.

* * * *

Q. What would you have advised . . . Wilson as to whether or not to accept the plea offer?

A. I would advise that we would go through a jury selection process[,] and we would have some insight based on our limited opportunity for *voir dire* about the way that jurors might perceive the evidence and they would hear the testimony and weigh the credibility of that. We can't predict exactly what the jury would think, but we have to try our best to imagine how they might weigh the evidence and then make the best possible decisions under the circumstances.

\* \* \* \*

Q. Did you discuss with . . . Wilson how the credibility of the witness would be affected or assessed in light of having . . . knowledge [of the mechanics of a male reproductive system at his age, or] that type of knowledge?

A. I don't recall if we discussed that specifically. My notes only say that . . . based on our discussion and review of the forensics that the victim was lying and that the testimony of the victim is sufficient to convict. That's all I know because that's all that I wrote in my notes and that's all that I can recall.

Q. You have no independent recollection of what occurred on the video . . . of the forensic interview?

A. No, sir.

Q. So if the child would have appeared at one point on the video and then when the issue of the rape is brought up, he becomes reserved and hides behind the chair, did you discuss with . . . Wilson the likelihood of prevailing at trial in light of that evidence?

A. I wish that I could recall our specific discussions. I can say that in my practice I try to discuss every relevant factor, piece of evidence, and that certainly would have been one, but I do not recall.

\* \* \* \*

Q. Do you recall from as much as you can recollect about the case what opinion that you formed on the strength of the case going to trial?

A. So in reviewing [Attorney Lowers'] memo, my notes[,] and my memory of the case, I am [confident] that I viewed this case as a very likely conviction.

Q. Did you tell that to . . . Wilson?

A. So[,] I do not have any specific recollection of that. In my practice that conversation usually happens where I sit down with a client, and it is several hours, we review all the evidence, we talk about how each individual piece of evidence could be viewed by a jury, how much weight each of those pieces of evidence would be at, and I explained my viewpoint of the case, that I think that it would likely result in a conviction, and then I try to make it clear that it is a hundred percent the client's decision whether or not to plead guilty and that I'm there to offer my advice. . . .

Q. Do you recall telling [Wilson] that if you likely lost that he was certain to get at least a sentence of incarceration of [twenty-five] to [fifty] years?

A. Yes. I do recall that. And[,] I specifically wrote a note in one of my jail interviews with him that we discussed that this was a second strike, and he would receive [twenty-five] to [fifty] years in prison at a minimum if he lost at trial.

* * * *

Q. Were you aware before trial in this matter that there was a counteroffer made?

* * * *

A. I don't recall whether or not I was aware of that when I was handling this case. I do know it now because I heard [Attorney Lowers] testify to it.

Q. And prior to trial in this matter you did not negotiate with the Commonwealth a plea offer?

A. So[,] my worst quality as an attorney is my inability to negotiate. I was never effective, I am not effective in negotiations, I just go proceed to the jury room. I know that.

* * * *

- 10 -

[Commonwealth's Attorney]: So[,] you said that you met with . . . Wilson on a couple of occasions prior to trial, right?

[Attorney Capone]: Correct.

Q. And in those couple of meetings you spoke about the plea offer?

A. . . . [I]t was [only] the first meeting with my client on November 2, 2018[,] that we discussed the plea offer [of seven] to [fourteen] years and he [said he did not] want to plead.

Q. He told you that he does not want to plead?

A. My notes indicate that he said that, yes.

Q. And were you aware that he had already rejected a plea offer when [Attorney] Lowers was representing him?

A. I do not recall that.

Q. So your impressions of the case was that this was always going to be a trial?

A. That was correct. From the outset of that first meeting I wrote down his height and weight and his clothing size, which meant that I needed to secure clothing for trial, which I would not have done unless we were going to proceed to trial. That was before I reviewed the forensic interview.

Q. And[,] the second client meeting was when you had a chance to review the forensic interview?

A. Yes, when I reviewed my notes.

Q. And did you have a second chance to remind . . . Wilson of the mandatory minimum if he was convicted?

A. Yes, I did. I wrote in my notes second strike, [twenty-five] to [fifty] and [Wilson] also understands.

Q. And you also explained that the testimony of the victim if believed is sufficient to convict?

A. Absolutely.

Q. And he understood that?

A. I don't have any indication that he understood or didn't understand, but based on my practice if he was unable to understand, I would have filed a motion to have a mental health evaluation.

Q. So you would have ensured in some way or other that he understood it was reviewed?

A. Yes. I mean, I believe that he could understand.

* * * *

Q. [W]hat was your impression of the Commonwealth's offer on this case?

* * * *

A. So if the allegations against my client are false, I would say that this offer, you would have to plead guilty to something that you didn't do to accept it.

Q. But[,] assuming that you go there, would you advise your client in these kind of situations that hey, you're looking at [twenty-five] if convicted, this is significantly less.

Is that something you would normally talk about?

A. I would, yes. I would lay out the amount of time included in the offer.

Q. And do you recall if you did that here?

A. Yeah, I do know that I did that here. We reviewed the offer. I would never advise my client to plead guilty to something that he didn't do.

Q. Because it is their choice to plead guilty, correct?

A. . . . It is his choice to plead guilty, but . . . if my client says that I didn't do this, but I want to plead guilty anyway, I can't facilitate that as a defense attorney.

Q. And your impression of --

A. I'm sorry. We could do a *nolo* plea, but I don't know whether or not that occurred in this case.

Q. So your impression of . . . Wilson in your discussions about the plea offer in the case generally was that he was innocent and that he wasn't going to plead to something that he didn't commit?

A. Yes, yes. He indicated the . . . victim was lying in this case.

N.T., 1/16/25, at 13, 15-16, 18, 22, 24-25, 28-33. (unnecessary capitalization omitted).

On February 10, 2025, the PCRA court entered an order denying Wilson's petition as it pertained to his ineffectiveness claim.[7] In response, Wilson filed a timely motion for reconsideration, as well as a timely notice of appeal.[8] The PCRA court entered an order denying Wilson's motion for reconsideration, and both Wilson and the PCRA court subsequently complied with Pa.R.A.P. 1925.

_____

[7] The PCRA court granted relief for the other issue that Wilson raised in his amended petition, related to the issuance of credit for time Wilson had already served when the court imposed the underlying sentence. *See* Order, 2/10/25, at 1; *see also* N.T., 1/16/25, at 66-67.

[8] Although the filing of a notice of appeal generally divests the trial court of jurisdiction, an exception applies where the defendant files a timely motion for reconsideration. *See* Pa.R.A.P. 1701(b)(3); *see also id*. Comment (stating "because the clock is running on the appeal period and the period for reconsideration simultaneously, filing the notice of appeal at the same time as or shortly after the motion for reconsideration will protect against waiver of the appeal if the trial court . . . fails to act").

Wilson raises the following issue for our review:

Whether trial counsel [were] ineffective — in violation of Article 1, Section 9 of the Pennsylvania Constitution and/or the Sixth and Fourteenth Amendments to the United States Constitution — for failing to (adequately) advise [Wilson] on whether to accept or reject the pre[]trial plea offer where, had trial counsel rendered adequate advice/consultation, [Wilson] would have accepted said plea offer and not gone to trial and was otherwise prejudiced as he serves a sentence greater than what he would have received under the terms of said plea offer?

Wilson's Brief at 2.

Our standard of review of an order denying a PCRA petition is well-

settled:

We review an order [denying] a petition under the PCRA in the light most favorable to the prevailing party at the PCRA level. This review is limited to the findings of the PCRA court and the evidence of record. We will not disturb a PCRA court's ruling if it is supported by evidence of record and is free of legal error. This Court may affirm a PCRA court's decision on any grounds if the record supports it. Further, we grant great deference to the factual findings of the PCRA court and will not disturb those findings unless they have no support in the record. However, we afford no such deference to its legal conclusions. Where the petitioner raises questions of law, our standard of review is *de novo* and our scope of review plenary.

***Commonwealth v. Ford***, 44 A.3d 1190, 1194 (Pa. Super. 2012) (citations

omitted).

Wilson's sole issue on appeal concerns whether his trial counsel

rendered ineffective assistance. In assessing a claim of ineffective assistance

under the PCRA, we presume that counsel has rendered effective assistance.

***See Commonwealth v. Reid***, 259 A.3d 395, 405 (Pa. 2021). To overcome

the presumption, the petitioner must show that:

(1) the underlying substantive claim has arguable merit; (2) counsel did not have a reasonable basis for his or her act or omission; and (3) the petitioner suffered prejudice as a result of counsel's deficient performance, that is, a reasonable probability that but for counsel's act or omission, the outcome of the proceeding would have been different.

*Id*. (citation and quotation marks omitted). The defendant must satisfy all three prongs of this test to obtain relief under the PCRA. *See id*. Accordingly, the failure to satisfy any one of these prongs will result in the rejection of the petitioner's ineffectiveness claim. *See id*.

Wilson argues that his trial counsel were ineffective for failing to properly advise him regarding whether he should accept or reject the Commonwealth's plea offer. Specifically, Wilson explains that his trial counsel failed to properly inform him of his chances of success at trial, as his "inconsistent statements to police on significant matters [and] the victim's unnaturally detailed knowledge of the function of the male sex organ and conduct during the forensic interview" would have prevented the defense from presenting any evidence that "would persuade the jury in considering an acquittal on any count or charge." Wilson's Brief at 24. Although Wilson acknowledges Attorney Capone's testimony in which he stated that he discussed the Commonwealth's plea offer with Wilson and that Wilson rejected it, Wilson emphasizes that at the time of this discussion, "Attorney Capone [had not seen] the [forensic interview] video, [nor did he] have a copy of the transcript of [this] interview at that time." *Id*. at 26. Accordingly, Wilson asserts that absent counsel's consideration of this evidence, his advice

- 15 -

regarding the plea offer could not have been "characterized as reasonable[,]" such that Wilson's "rejection of the plea offer at that time was [therefore] not knowingly or intelligently made." *Id*.

Wilson further avers that his trial counsel did not adequately explain to him that "[t]he alternative of acquittal or a sentence of less than [twenty-five] to [fifty] years['] incarceration after trial were not realistically available" to him. *Id*. at 31. Particularly, Wilson maintains that his convictions at trial were "foreshadowed by information available to the defense and the law existing prior to trial" to the extent that "any advice/assessment by counsel that any chance of avoiding the mandatory sentence by going to trial was objectively unreasonable." *Id*.

Wilson contends that he would have instead accepted the Commonwealth's plea offer if either of his trial counsel had properly advised him that: (1) "the evidence against him [was] surely to result in conviction on at least the offense of rape of a child;" (2) his "testimony at trial, cross-examination of prosecutions witnesses, and any other defense arguments or evidence would not enhance, in [Wilson's] favor, the very dim chances of creating reasonable doubt for purposes of the convictions for, at the very least, rape of a child or indecent assault;" and (3) he did not have a "realistic chance of receiving a sentence of incarceration lower than [twenty-five] to [fifty] years absent acceptance of the Commonwealth's plea offer." *Id*. at 31-32 (unnecessary capitalization omitted). Indeed, Wilson argues that his

willingness to "authorize[] Attorney Lowers to propose a counter[]offer modifying the plea offer[,]" evidenced his interest in pleading guilty. *Id*. at 32. Further, Wilson points out that although "Attorney Capone did not recall advising [Wilson] about the likelihood of prevailing at trial[,]" said counsel specifically testified that in his "usual practice in representing clients, [he] would not, if a client proclaimed innocence, assist a client in pleading guilty." *Id*.

Wilson avers that Attorney Capone's late assignment to the case did not excuse his failure to adequately advise Wilson regarding the plea agreement, as "the case was not complex[, such that] Attorney Capone had more than enough time to acquire knowledge of, and understand, the salient factual matters which would bear on [Wilson] making an informed decision on whether to plead guilty or proceed to trial[.]" *Id*. at 35. In support, Wilson points to Attorney Capone's: (1) acknowledgment of his belief that Wilson's case would very likely result in a conviction based on the prosecution's evidence; and (2) lamentation regarding the idea that Wilson would effectively spend the rest of his life in prison if sentenced to at least twenty-five years. Wilson insists that, "based on [the] information available to counsel prior to trial, [a guilty verdict] was clear and unavoidable such that nothing which actually occurred while the case was tried would affect" counsel's pretrial assessment. *Id*. Thus, Wilson avers that even though Attorney Capone properly advised him that the victim's testimony alone was sufficient to

support a conviction for the Commonwealth's charges, it "did not satisfy/discharge Attorney Capone's duty/obligation to advise [Wilson] about" the aforementioned likelihood that Wilson would not prevail at trial. *Id*.

Wilson next asserts that his ineffectiveness claim has arguable merit, as his counsel failed to relay: (1) the relative credibility that a jury would attribute to both his and the victim's testimony at trial; (2) the likely result at trial based on the testimony and evidence that the parties would present; and (3) a recommendation as to whether Wilson should seek a plea deal or proceed to trial. In regard to this third point, Wilson emphasizes that "Attorney Lowers' initial reaction was that *she* wanted to make a counter[]offer [in response to the Commonwealth's initial plea proposal] for a lesser term of incarceration," to the extent that although Wilson "also wanted to see a shorter term of incarceration as part of a guilty plea, the decision was unquestionably made without a recommendation [as to whether Wilson should] accept the offer." *Id*. at 36-37. Wilson avers that Attorney Capone was similarly ineffective, as he prematurely decided during their initial meeting, and thus prior to viewing the forensic interview, that "the case will go to trial . . . and [that] he would not assist a client to plead guilty when the client asserts — early into Attorney Capone's communications with a client — [their] innocence." *Id*. at 37. As such, Wilson argues "the record does not support the PCRA court's finding that [his ineffectiveness claim] is lacking in arguable merit or that trial counsel had

a reasonable basis for the conduct (acts or omissions) in advising [Wilson] about the plea offer." *Id*.

Moreover, Wilson asserts that the PCRA court improperly relied on ***Commonwealth v. Ridenbaugh***, 118 A.3d 446 (Pa. Super. 2015) (unpublished memorandum) in denying his ineffectiveness claim. Specifically, Wilson maintains that ***Ridenbaugh*** is distinguishable from the instant case, as it involved: (1) trial counsel explicitly testifying that "he advised the defendant about the strengths and weaknesses of the case prior to trial[;]" and (2) the defendant nonetheless rejecting the offer due to an insistence that he was innocent and that he did not want to serve any jail time due to his poor health. *Id*. at 41. In contrast, Wilson argues that he "was not dead-set against serving a sentence of incarceration[,] showed interest in pleading guilty[, and] neither trial counsel testified to informing [him] about the strengths and weaknesses of the case." *Id*.

Similarly, Wilson argues that the court's reliance on Attorney Capone's reference to his "practice of starting jury selection to get a sense of how the jury would assess credibility of witnesses and then reassess how to proceed" is also misplaced, as Wilson contends that such a practice would not uncover "any significant signal" as to how a jury would view certain evidence or testimony, and that Attorney Capone's reliance on such a strategy instead reinforces the idea that "he did not address [whether Wilson should plead guilty] prior to jury selection." *Id*. at 43.

Finally, Wilson avers that counsels' ineffectiveness was prejudicial, as it resulted in him proceeding to trial and receiving a worse outcome than he would have received had he accepted the Commonwealth's plea offer. Pertinently, Wilson highlights that the Commonwealth's plea offer purported to withdraw the charges of unlawful contact with a minor and EWOC, and that the exclusion of these charges would have resulted in an "aggregate statutory maximum for the [remaining] counts" of forty-seven to fifty-four years. — a lesser term than his current sentence of thirty to sixty years' incarceration, followed by a consecutive five years' probation. *Id*. at 44. Thus, Wilson argues that because "the PCRA [c]ourt did not indicate any reason for rejection of the provision of the plea offer for the partial withdrawal of charges[,]" trial counsels' ineffectiveness prejudiced him to the extent that this Court should grant relief. *Id*. at 45.

The PCRA court determined that Wilson's ineffectiveness claim was without merit, reasoning as follows:

> The testimony at the PCRA hearing failed to establish the three prongs of ineffective assistance of counsel. Both counsel, to the extent that they could recall, testified that they consulted with [Wilson] and explained the relevant issues. Neither attorney testified to deviating from their standard practice of ensuring a defendant was well advised as to the factors to consider in accepting or rejecting a plea. [Attorney] Capone testified that he would not have proceeded to trial if he was not prepared and part of being prepared is adequately advising [Wilson] on the strength of the Commonwealth's case, the credibility of witnesses, and [Wilson's] plea options. [Wilson] stated that he did not want to plead guilty. Considering the totality of the circumstances, this court did not err in denying the PCRA petition.

PCRA Court Opinion, 3/31/25, at 5-6 (unnecessary capitalization omitted).

After reviewing the record in the light most favorable to the Commonwealth as the verdict winner, we discern no error or abuse of discretion by the PCRA court in reaching its determination that Wilson's ineffectiveness claim was without merit. In doing so, we preliminarily note that Wilson had the opportunity to independently discuss the strength of his case and the Commonwealth's plea offer with each of his appointed trial counsel. As it relates to his first-such counsel, Attorney Lowers testified that she and Wilson had watched the forensic interview prior to their receipt of the Commonwealth's written plea offer. Accordingly, when Attorney Lowers presented the offer to Wilson with the recommendation that he submit a counteroffer seeking less time, and consequently not proceed to trial, she was "as transparent [and detailed] as possible" regarding her impressions of the Commonwealth's existing evidence. N.T., 1/16/25, at 7, 10. Even with this information, however, Wilson maintained "a desire to potentially go to trial . . . if the plea offer[, which we note was already significantly lower than the mandatory minimum for the charges he was facing,] wasn't significantly lower." *Id*. at 11.

Should his discussions with Attorney Lowers have been somehow insufficient, we highlight that Wilson had the rare opportunity to receive a second opinion from Attorney Capone. Notably, while Attorney Capone could not remember many of the specifics regarding his conversations with Wilson,

he was confident that he believed Wilson's case was "a very likely conviction" at the time, and that he informed Wilson that: (1) he would receive at least twenty-five to fifty years' imprisonment if he lost at trial; and (2) the Commonwealth's witness testimony alone was sufficient to result in a conviction. *Id*. at 24. Attorney Capone insisted that in his usual practice, he would have sat down with Wilson for several hours to "review all the evidence, . . . talk about how each individual piece of evidence could be viewed by a jury, how much weight each of those pieces of evidence would [have], and . . . explain [his] viewpoint of the case . . . that it would likely result in a conviction." *Id*. at 24-25. From this, the PCRA court concluded that Attorney Capone "would not have proceeded to trial if he was not prepared[,] and [that] part of being prepared [would have been] adequately advising [Wilson] on the strength of the Commonwealth's case, the credibility of witnesses, and [his] plea options." PCRA Court Opinion, 3/31/25, at 5-6. Again, however, Wilson nonetheless declined to accept the plea offer, and instead further impressed upon counsel that he was innocent, the victim was lying, and that "he wasn't going to plead to something that he didn't commit[.]" N.T., 1/16/25, at 33.

On this record, it is clear that Attorney Lowers and Attorney Capone each independently discussed the Commonwealth's plea offer with Wilson, and Attorney Capone advised him about the likelihood of conviction. Thus, even though Wilson declined to heed counsels' advice at both junctures by refusing the Commonwealth's plea offer and instead expressing a desire to go to trial,

this result does not change the fact that he was properly informed at the time he made the unilateral decision to go to trial. Wilson's post-trial and post-sentencing regret at not having accepted a plea offer is an insufficient basis to find that his trial counsel was ineffective. Accordingly, we conclude the PCRA court did not abuse its discretion in finding Wilson's ineffectiveness claim meritless, and we affirm its order denying relief.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 08/27/2025